# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PATRICIA BRENNAN, | ) |
| Plaintiff, | ) No. 04 C 2530 |
| v. | ) Judge Ronald A. Guzmán |
| NAPERVILLE SCHOOL DISTRICT 203, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Patricia Brennan has sued Naperville School District 203 for its alleged violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Rehabilitation Act ("Rehab Act"), 29 U.S.C. § 701 *et seq.* and her First Amendment rights and for its alleged interference with her prospective business advantage. The case is before the Court on defendant's Federal Rule of Civil Procedure ("Rule") 56(c) motion for summary judgment. For the reasons set forth below, the Court grants the motion with respect to the federal claims and declines to exercise supplemental jurisdiction over the state-law claim.

## Facts[1]

Defendant operates fourteen elementary schools, five middle schools and two high schools. (Def.'s LR 56.1(a) Stmt. ¶ 2.) Brennan is a social worker who has Meniere's disease, a condition that causes her to suffer periodically from vertigo and has caused a hearing loss in her left ear. (*Id.* ¶¶ 99-100; Pl.'s Ex. Supp. Opp'n Mot. Summ. J., Ex. 40, Wiet Aff. ¶ 7.)

---

[1] Unless otherwise noted, the following facts are undisputed.

In 1999, defendant hired Brennan to work as a non-tenured behavior learning specialist. (Def.'s LR 56.1(a) Stmt. ¶ 11.) In that position, Brennan worked with only one student at one grade school. (*Id.* ¶ 13.) Brennan received a rating of satisfactory on her year-end evaluation for the 1999-2000 school year. (*Id.* ¶ 20.) On March 20, 2000, the Board of Education voted to renew Brennan's contract for the 2000-01 school year. (*Id.* ¶ 22.)

During the 2000-01 school year, Brennan worked as a district-wide behavior learning specialist. (*Id.* ¶ 23.) Plaintiff received a satisfactory rating on both her mid-year and year-end evaluations. (*Id.* ¶¶ 28, 30.) In March 2001, the Board of Education voted to renew Brennan's contract for the next school year. (*Id.* ¶ 32.)

For the 2001-02 school year, Brennan was assigned to work at Naperville North High School as part of a team that handled behavior-disordered students. (*Id.* ¶¶ 33-34.) The team consisted of teachers Dan Trudeau and Jenny Greenfield, teachers aides Linda Polomsky and Lawrence Stepney, guidance counselor Melinda Zayner, psychologist Eric Smith and plaintiff. (*Id.* ¶ 35.) In this position, Brennan was supervised by Sue Hubbard, Naperville North's Special Education Instruction Coordinator. (*Id.* ¶ 36.) Hubbard's supervisor was Kathy Briseno, the District Special Education Coordinator who had responsibility for Naperville North, and Briseno's supervisor was Amy Kruppe, the District's Director of Special Education. (*Id.* ¶¶ 37-38.)

Brennan's office at Naperville North was not ready when school started on August 22, 2001. (*Id.* ¶ 42.) She was temporarily assigned to another office, shared by others, until her office was ready for use. (*Id.* ¶ 43; Pl.'s LR 56.1(b)(3)(A) Stmt. ¶ 43; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 19.)

On September 5, 2001, Brennan had a meeting with Hubbard, Briseno, Kruppe and Naperville North Principal Ross Truemper about the office situation. (Def.'s LR 56.1(a) Stmt. ¶ 48.)

In the course of the meeting, Brennan cried, "expressed very strong feelings about not having an office" and said "no one should be expected to work like this." (*Id.* ¶¶ 49-50.) The next day, her office was ready and she moved into it. (*Id.* ¶ 52.)

Defendant says that Brennan's unprofessional behavior continued throughout September, October and November 2001. Specifically, defendant says she was rude to staff members, demeaned Trudeau in front of students, interrupted other team members during meetings, refused to listen to input from other team members and became defensive and argumentative in the face of constructive criticism. (*Id.* ¶¶ 53-56, 60-63, 65, 68.)

Brennan generally denies that she behaved inappropriately. But she admits that she: (1) was "frequently encouraged to work on her 'teamwork'" (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 15); (2) had some disputes with teachers "about proper behavior modification to be used on disruptive students" (Pl.'s LR 56.1(b)(3)(A) Stmt. ¶ 39); (3) had some "conflicts with staff related to differences in behavior theory and best practices [to use]" (*id.*; *see* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 17); (4) had "differences with [Trudeau] regarding how a special [e]d class was to be taught" because Brennan "thought the materials for that class were one-sided and overly provocative" (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 17); (5) "expect[ed] that staff would defer to her expertise when involved in behavior management or modification issues with students" (*id.* ¶ 26); (6) "had to put [teacher's aide Polomsky's] opinions in perspective" when Polomsky "interject[ed] her social work opinion [when] unqualified to do so" (*id.* ¶ 28); and (7) was "[d]efensive[] [and] interrupt[ed]" others in meetings (*id.* ¶ 29).

On November 9, 2001, plaintiff filed a grievance in which she said: (1) her workload made it impossible for her to take a lunch break; (2) her ability to complete work timely was impeded by

3

her lack of appropriate equipment and supplies; (3) she was improperly assigned as the sole supervisor of the in-school intervention room, which was, in any event, an unsafe environment; (4) the social development group to which she was assigned was organized as a class and, as such, fell outside of her expertise; and (5) her performance was being evaluated according to teacher standards, rather than social worker standards, as it should have been. (Def.'s LR 56.1(a) Stmt. ¶ 67; Def.'s Materials Supp. Mot. Summ. J., Vol. II, Ex. 4, Pl.'s Dep. Ex. 21, 11/9/01 Grievance.) At the end of the list of complaints, the grievance says:

> Finally, this entire situation has had a negative impact on [Brennan's] physical health. She has Meniere's disease with dizziness, decrease of hearing in her left ear, vertigo, and loss of balance. Focused stress over lengthy periods, such as what she is experiencing at her work, may be a direct contributor to the progression of the disease as well as migraine headaches. This stress must stop.

(*Id.*)

The only remedies plaintiff requested were that:

> [she] be assigned an appropriate lunch break each day, that she be provided with the appropriate planning time and equipment as noted in #2 above, that she be assigned an appropriate share of In-School Intervention, not as sole supervisor, and that she be provided with appropriate assistance with safety, that she be allowed to supervise the Social Development Group within the framework of sound social work practice and that her overall workload be adjusted to provide for the possibility of her being a successful employee in District #203.

(*Id.*)

In his response to her grievance, Principal Truemper denied that Brennan's workload was excessive, that she lacked proper equipment and that she was treated unfairly or inappropriately in any way. (Def.'s Materials Supp. Mot. Summ. J., Vol. I, Ex. 2, Pl.'s Dep. Ex. 25, 12/13/01 Resp. Grievance.)

4

On December 10, 2001, Truemper gave Brennan a mid-year evaluation with a rating of unsatisfactory. (Def.'s LR 56.1(a) Stmt. ¶ 71.) Among other things, the evaluation says that Brennan needs: (1) "to project a professional demeanor consistently during meeting[s]" and "to allow team members to complete statements before speaking"; (2) "to become more open to professional feedback" and "to accept feedback without having to explain, make excuses or become defensive"; (3) "to meet administrators request[s] independent of reminders"; and (4) "to make use of building personnel appropriately." (*Id.* ¶ 72.)

At some point, plaintiff requested that her union provide her with legal representation in connection with her disputes with Naperville North. On January 4, 2002, the union rejected her request because "there [was] not a reasonable likelihood of success in any legal action." (Def.'s Materials Supp. Mot. Summ. J., Vol. I, Ex. 2, Pl.'s Dep. Ex. 26, 1/4/02 Letter to Brennan from Klenck.)

On January 28, 2002, Brennan wrote an action plan in response to her mid-year evaluation in which she said she "needs to continue to be open to professional feedback" and would "dialogue with all NNHS staff in a professional manner." (Def.'s Materials Supp. Mot. Summ. J., Vol. II, Ex. 4, Pl.'s Dep. Ex. 30, 1/28/02 Action Plan (emphasis omitted).)

On March 31, 2002, plaintiff received a rating of unsatisfactory in her year-end evaluation. (Def.'s LR 56.1(a) Stmt. ¶ 82.) Among other things, the evaluation says:

> Pat needs frequent reminders not to interrupt, not to be defensive, and to watch her nonverbal communication. Dialogue during team meetings often goes back to her, her needs, and her defense of the job she felt she was doing. These concerns have been discussed with suggestions offered but progress has been minimal. This lack of progress impacted the effectiveness of the program and services to the students.

. . . .

... Although Pat has made connections with students and parents, her overall effectiveness within her team and the NN community does not meet district standards as a staff member who is well-grounded and able to make a positive impact in more areas than working with students.

(Def.'s Materials Supp. Mot. Summ. J., Vol I, Ex. 2, Pl.'s Dep. Ex. 32, 3/8/02 Evaluation.)

Subsequently, Truemper recommended to Assistant Superintendent Gayle Wahlin that Brennan's contract not be renewed for the 2002-2003 school year. (Def.'s LR 56.1(a) Stmt. ¶ 84.) On March 21, 2002, the Board of Education voted not to renew Brennan's contract. (*Id.*)

On April 5, 2002, Brennan filed a complaint with the Illinois Department of Human Rights ("IDHR") alleging that defendant had discriminated against her on the basis of her disability. (*Id.* ¶ 87.) On July 17, 2003, the IDHR dismissed her complaint for lack of jurisdiction and lack of substantial evidence. (*Id.* ¶ 89.)

## The Legal Standard

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

## Discussion

### Federal Claims

In Count I of her first amended complaint, plaintiff alleges that defendant violated the ADA by failing to renew her contract for the 2002-03 school year and by refusing to accommodate her disability. To make a *prima facie* case on these claims, Brennan must show that she is disabled, she could perform the essential functions of her job with or without reasonable accommodation and defendant took an adverse employment action against her because of her disability or failed to reasonably accommodate her disability. *Stevens v. Ill. Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000). Defendant says Brennan cannot satisfy the first element because there is no evidence that she is disabled as defined by the ADA.

Plaintiff is disabled within the meaning of that statute if she: (1) has "a physical or mental impairment that substantially limits one or more of [her] major life activities"; (2) has "a record of such an impairment"; or (3) is "regarded as having such an impairment." 42 U.S.C. § 12102(2); *see* 29 C.F.R. § 1630.2(g). A "physical or mental impairment" includes "[a]ny physiological disorder, or condition . . . affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)(1). It is undisputed that Meniere's disease affects plaintiff's left inner ear, has reduced her hearing in that ear and causes her to suffer from vertigo. (Pl.'s Ex. Supp. Opp'n Mot. Summ. J., Ex. 40, Wiet Aff. ¶ 7; *id.*, Ex. 41, Chicago Otology Group Booklet at 10.) Thus, Meniere's disease is a physical or mental impairment within the meaning of the ADA.

7

To be a disability, however, Brennan's impairment must also substantially limit a major life activity. Major life activities include: "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Brennan is "substantially limited" in a major life activity if she is "[u]nable to perform a major life activity that the average person in the general population can perform" or is "[s]ignificantly restricted as to the condition, manner or duration under which [she] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). The determination of whether an impairment is substantially limiting is made on an individual basis by considering three factors: (1) "[t]he nature and severity of the impairment"; (2) "[t]he duration or expected duration of the impairment"; and (3) "[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

Brennan contends that her condition substantially limits the major life activities of hearing and walking. It is undisputed that plaintiff had a hearing loss in her left ear that her doctor characterized as "sever[e]." (*See* Def.'s Materials Supp. Mot. Summ. J., Vol. I, Ex. 2, Pl.'s Dep. Ex. 30, 2/8/02 Letter from Rubach to Ray.) But she has offered no evidence to show how that loss affected her overall ability to hear in comparison to that of an average person in the population, whether the loss was mitigated by the use of a hearing aid and whether, when the loss occurred, it was expected to be temporary or permanent.[2] Absent such evidence, Brennan has not raised a genuine issue of fact on whether Meniere's disease substantially limited her ability to hear.

---

[2] After her termination, plaintiff had an operation that restored her hearing. (Pl.'s LR 56.1(b)(3)(A) Stmt. ¶ 111.)

She has also not raised an issue for trial on whether her ability to walk was substantially limited. The evidence suggests that Brennan's ability to walk was impaired during episodes of vertigo. (*Id.*, Pl.'s Dep. Ex. 12, 9/10/01 Letter to Kruppe from Rubach.) But the record does not suggest that her walking was impaired when she did not have vertigo, and it does not disclose how often vertigo episodes occurred or how long they lasted. Brennan has not, therefore, raised a genuine issue of fact on whether Meniere's disease substantially limited her ability to walk.

Even if her condition did not substantially limit any major life activity, Brennan says she is still disabled under the ADA because defendant regarded her as having a substantially limiting impairment. 42 U.S.C. § 12102(2); *see Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 335 (7th Cir. 2004) ("A person is 'regarded as disabled' when the employer, rightly or wrongly, believes that she has an impairment that substantially limits one or more major life activities."). The only evidence Brennan offers on this point is the statement in her last year-end evaluation that Brennan is not "a staff member who is well-grounded." (Def.'s Materials Supp. Mot. Summ. J., Vol. I, Ex. 2, Pl.'s Dep. Ex. 32, 3/8/02 Evaluation.) Because Meniere's disease can cause emotional disturbances, Brennan says, the "well-grounded" comment must refer to her condition.

Even if this leap of logic were supported by the record, and it is not, it would not help plaintiff's case. Defendant regarded Brennan as disabled only if it believed both that her emotional issues were caused by Meniere's disease and that the emotional problems substantially limited one of her major life activities. *Cigan*, 388 F.3d at 335. There is no evidence that anyone at Naperville North viewed Brennan's emotional issues as limiting one of her major life activities. Without such evidence, Brennan has not raised a triable fact issue on whether defendant regarded her as disabled.

Brennan's failure to raise a fact issue on the existence of a disability dooms her ADA claims. Even if she had satisfied that element, however, her claims would still fail because she has not raised a triable issue of fact on the other claim elements. Though Brennan contends she was adequately performing the functions of her job, the undisputed facts show that she had problems interacting with other staff members almost from the moment she started to work at Naperville North. Brennan admits that she became angry and emotional in a meeting with her supervisors about her temporary office space only nine days into the school year. (Pl.'s LR 56.1(b)(3)(A) Stmt. ¶¶ 48-50.) Subsequently, she also admits, she had disputes with teachers and staff about proper behavior modification techniques, expected staff to defer to her when student behavior issues arose, admonished teacher's aide Polomsky when she "interject[ed] her social work opinion [when] unqualified to do so," and was "[d]efensive[] [and] interrupt[ed]" others in meetings. (*Id.* ¶ 39; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 17, 26, 28-29; *see* Pl.'s Exs. Supp. Opp'n Mot. Summ. J., Ex. 16, 11/27/01 Mem. to Kruppe from Brennan.) These admissions support, rather than refute, defendant's assertion that she was not satisfactorily performing her job.

Brennan has also not offered any evidence to suggest that her condition, rather than her conduct, was the real reason for defendant's decision not to renew her contract. There is no evidence, for example, that her supervisors refused to give her time off when she experienced symptoms, that they expressed hostility about her need for such time off, that they made derogatory comments to or about people with disabilities or that they have a history of taking adverse actions against people with disabilities. Absent such evidence, Brennan has not raised a material issue on pretext. Thus, she could not defeat defendant's motion on her ADA discrimination claim even if she had satisfied the disability element.

Also missing from the record is any evidence to suggest that defendant failed to make reasonable accommodations to plaintiff's condition. Plaintiff says two letters her doctor sent to defendant contained her accommodation requests. (*See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 49.) In relevant part, the first letter states: "[Brennan] has periodic symptoms of severe vertigo which can be debilitating to the point of requiring bed rest. . . . Usually the vertigo lasts anywhere from one to three days. During this time, she may require [a] leave of absence." (Def.'s Materials Supp. Mot. Summ. J., Vol. I, Ex. 2, Pl.'s Dep. Ex. 12, 9/10/01 Letter from Rubach to Kruppe.) The second letter says:

> [Meniere's disease] has caused [Brennan] periods of significant disability at which time she is unable to perform her daily duties. These symptoms could last anywhere from several hours to several days.
>
> She has had progression in her symptoms which include hearing loss at present. Her hearing in the left ear is severely reduced. This is primarily worse in the low and mid frequencies. . . .
>
> The patient is pursuing a hearing aid to help her with her hearing loss in the left ear. . . .

(*Id.*, Pl.'s Dep. Ex. 30, 2/8/01 Letter to Ray from Rubach.)

To the extent these letters constitute requests for accommodation, the only accommodation they seek is that Brennan be given time off from work when she suffers attacks of vertigo. It is undisputed that defendant provided that accommodation to Brennan. (*See* Pl.'s LR 56.1(b)(3)(A) Stmt. ¶¶ 105-06 (admitting that Brennan was permitted to leave work early and take days off when she suffered from vertigo).) Thus, plaintiff could not make a *prima facie* case on her failure to accommodate claim, even if she had offered sufficient evidence that she is disabled within the meaning of the ADA.

11

In the second count of her first amended complaint, Brennan alleges that defendant retaliated against her for her complaints about its violations of the ADA and the Rehab Act. A prerequisite to a retaliation claim under either statute is evidence that Brennan engaged in statutorily-protected activity. *See Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003) (setting forth elements of retaliation claim); 29 U.S.C. § 794(d) (stating that the standards for determining whether the Rehab Act has been violated in an employment discrimination suit are the same as those used for claims raised under, among others, section 12203 of the ADA); 42 U.S.C. § 12203(a) (prohibiting retaliation against anyone who "has opposed any act or practice made unlawful by [the ADA]"). The record contains no evidence of protected activity.

It is undisputed that Brennan voiced a number of complaints to defendant, but none of them concerned her medical condition or defendant's treatment of disabled employees. Rather, she complained about: her office space, equipment and supplies; a disciplinary letter that had been placed in her personnel file, but was later removed, for tardiness; her workload; her inability to take a lunch break; her assignment to supervise the in-school suspension room; the organization of the social development group she was assigned to lead; and the standards her supervisors used to evaluate her performance. (*See* Pl.'s LR 56.1(b)(3)(A) Stmt. ¶ 48; Pl.'s Exs. Supp. Opp'n Mot. Summ. J., Ex. 9, 10/24/01 Letter to Truemper from Ray; *id.*, Ex. 10, 12/26/01 Letter to Ray from Whalin; *id.*, Ex. 11, 11/6/01 Letter to Truemper from Ray; *id.*, Ex. 12, Brennan's Notes re: 2001-02 School Year; *id.*, Ex. 16, 11/27/01 Mem. to Kruppe from Brennan.) Because there is no evidence to suggest that Brennan engaged in statutorily-protected activity, her retaliation claims fail.

In the third count of her first amended complaint, Brennan alleges that defendant failed to renew her contract in retaliation for her criticism of its special education curriculum. Brennan seeks

redress for this alleged violation of her First Amendment rights pursuant to 42 U.S.C. § ("section") 1983. Defendant can be held liable under section 1983, however, only if Brennan's alleged injury was the result of one if its policies or customs. *Cornfield ex rel. Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1324 (7th Cir. 1993) ("[M]unicipalities, including school boards, may not be held liable under section 1983" unless "execution of a government's policy or custom . . . inflicts the injury [for which] the government as an entity is responsible under § 1983." (quotation omitted)). That standard is satisfied if Brennan's injury was caused by one of defendant's express policies, by a practice so widespread and permanent that it constitutes a *de facto* policy or by a person with final policy-making authority. *Baxter ex rel. Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 734-35 (7th Cir. 1994). Plaintiff says her case falls into the last category because Principal Truemper, a policy-maker for defendant, made the allegedly retaliatory decision not to renew her contract.

State law determines who is a policy-maker for section 1983 purposes. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). The Illinois School Code vests the power to terminate teachers solely in defendant. 105 ILL. COMP. STAT. 5/10-22.4. Thus, defendant says, Truemper cannot be a final policy-maker with respect to this employment decision.

Defendant may be the policy-maker in theory, plaintiff says, but in practice, school principals determine which teachers will be dismissed and defendant rubber-stamps those decisions. Plaintiff's support for that contention is her report of a conversation that she had with board member Deborah Shipley. According to Brennan, Shipley turned down her request to speak to the School Board before it voted on whether to renew her contract because "the board did not get that deeply involved with those decisions." (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 3.) Shipley's alleged statement, which can

be construed as an admission by a party opponent, is sufficient to raise an issue for trial as to whether defendant delegated to Truemper its power to dismiss Brennan.

Having vaulted the policy hurdle, Brennan must also show that she engaged in constitutionally-protected speech, her speech was a motivating factor in her termination and she would not have been fired absent the protected speech, if she is to defeat defendant's motion. *Cygan v. Wis. Dep't of Corr.*, 388 F.3d 1092, 1098 (7th Cir. 2004). Speech is constitutionally protected, if it is on a matter of public concern and the employee's interest in commenting on the issue outweighs the employer's interest in providing efficient public services. *Id.* at 1099. To determine whether speech addresses a matter of public concern, "we consider the content, form, and context of a given statement, as revealed by the whole record" as well as the "employee's choice of forum and motivation for speaking." *Id.* (quotation omitted). "At bottom, we must decide whether the speech is most accurately characterized as an employee grievance, or as a matter of political, social, or other concern to the community." *Id.*

Brennan says the speech for which she was terminated was her complaint that inappropriate materials were used for the social development group. (Pl.'s Mem. Opp'n Mot. Summ. J. at 11-12.) The propriety of the curriculum for special education students may be a subject of interest to the community at large. But the context of Brennan's speech shows that it was motivated primarily, if not entirely, by her quest to improve her position at the school, not by concern about the special needs curriculum.

Brennan first raised her objection to the social development group materials with Trudeau, the teacher who had "assumed a leadership role" for the group. (Pl.'s Exs. Supp. Opp'n Mot. Summ. J., Ex. 12, Brennan Notes re: 2001-02 School Year at 5.) He disagreed with her assessment of the

14

materials and continued to use them. (*See id.* ("Mr. Trudeau's response was: 'I need to keep them on the edge to hold their interest.'").) Dissatisfied, Brennan mentioned the issue to Kruppe, Truemper, Briseno, Hubbard and union representative Bob Ray, when she met with them to discuss her complaints about the school and her problems interacting with other staff members. (*See* Def.'s Materials Supp. Mot. Summ. J., Vol, I, Ex. 2, Pl.'s Dep. Ex. 22, 11/27/01 Mem. to Kruppe from Brennan at 3.) Apparently, her complaints again fell on deaf ears because she reiterated it in a memorandum of concerns that she sent to Kruppe in November 2001. (*Id.*)

As the memorandum makes clear, however, Brennan did not complain about the materials themselves, but about the fact that her objection to them had been communicated to Trudeau:

> An incident that is of grave concern to me relates to me sharing my discomfort about the students viewing "Boston Public" weekly when we all met with Mr. Ray the first time. Shortly after this, Mr. Trudeau approached me, stating, "I was told by one of the administrators that a little birdie came to administration and complained about 'Boston Public.'" . . . This entire topic should not even be an issue to begin with. Since we have agreed to really preview the episodes, it has only been deemed appropriate to show it once. At times I, unfortunately[,] wonder what other information is being shared from part time instructional co-ordinator down to my peers.

(*Id.* at 3.) Brennan's notes to Ray about her experiences at Naperville North also illustrate that the focus of her complaint was not the materials themselves, but the fact that her opinion of them was disregarded:

> [T]here are major decisions that have been made by the teachers outside the team process and then brought to the team as things we were going to do. . . .
>
> . . .
>
> One half of every other Friday is instruction-free for students that make 80% of their points: I feel students need to be rewarded, but am uncomfortable with this much instructional time being lost. Additionally, I am very uncomfortable with the movie they watched. . . . I have shared my uneasiness with the teachers to no avail. . . . This inappropriate content applies to the 7th hour Social Developmental Group as

15

> well .... Every Tuesday they watch the unedited edition of the TV show, "Boston Public" which Mr. Trudeau tapes the night before. While I happen to enjoy the show, it includes episodes [with content inappropriate for students in the Social Development Group]. These kids are high energy and reactive baseline without further stirring them up.

(Pl.'s Exs. Supp. Opp'n Mot. Summ. J., Ex. 12, Brennan Notes re: 2001-02 School Year at 4, 5 (emphasis omitted).) As these documents make clear, Brennan voiced her objections to the social development group materials in a purely personal context: her struggle to exert more control over the social development group.

The manner in which she chose to make her objections also suggests that she was speaking on a matter of private, not public, concern. Brennan did not voice her objections at a school board meeting or in the media. Rather, she told her supervisors, to support her complaints of unfair treatment and to refute their accusation that she needlessly fomented conflict, and her union representative, to facilitate the grievance process. The fact that Brennan raised this issue in private meetings and correspondence, and did so for the purpose of protecting or improving her position at the school, strongly suggest that her speech was on a manner of private concern. *See Colburn v. Trs. of Ind. Univ.*, 973 F.2d 581, 586 (7th Cir. 1992) (criticism of university's review process made in letters to university officials during "a faculty feud" held not a matter of public concern).

In short, though the content of Brennan's speech may be of interest to the public, the undisputed context and manner in which she spoke establish that she did so largely, if not exclusively, to further a personal goal. Because the record establishes that Brennan's speech was part and parcel of her personal grievance against her employer, it is not protected speech. *See Barkoo v. Melby*, 901 F.2d 613, 620 (7th Cir. 1990) (holding that employee's criticism of overtime policy in a memorandum sent to her supervisors was not matter of public concern because "[t]he

context in which the memorandum was written was one of increasing hostility between [the employee] and her superiors; discipline . . . already had been handed down, grievances had been filed, and [the employee] was in the process of flooding her superiors with complaints, appeals and other memoranda.").

Moreover, even if Brennan's speech were protected, she still could not get to trial on her First Amendment claim. To do so, Brennan would have to raise a triable fact issue on whether her contract would have been renewed if she had not spoken out. As noted above, Brennan admits that she had problems interacting with her colleagues and supervisors at Naperville North from the very start of the 2001-02 school year. It is undisputed that those problems started before her allegedly protected speech and continued after it. (*See* Pl.'s LR 56.1(b)(3)(A) Stmt. ¶¶ 48-50 (admitting she became angry and emotional about her office not being ready at the beginning of the year); Def.'s Materials Supp. Mot. Summ. J., Vol. II, Ex. 2, Pl.'s Dep. Ex. 3, 9/14/01 Letter to Whom It May Concern from Zayner (stating that Brennan demeaned Trudeau in front of students and interrupted others in meetings); *id.*, Ex. 4, Undated Memorandum by Polomsky (recounting incidents that occurred two weeks into the school year in which Brennan insisted that her input be considered or followed when teachers had decided it was not necessary or desirable); Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 26, 28-29 (stating that: she expected staff to defer to her expertise; her need to put Polomsky's opinions on social work "in perspective" may have "hurt [Polomksy's] feelings"; she was sometimes defensive and interrupted others in meetings).) Ultimately, those problems were her undoing. (*See* Def.'s Materials Supp. Mot. Summ. J., Vol. I, Ex. 2, Pl.'s Dep. Ex. 32, 3/8/02 Evaluation (stating that Brennan's "overall effectiveness within her team and the NN community does not meet district standards as a staff member who is well-grounded and able to make a positive impact in more areas

than working with students").) Brennan has offered no evidence that suggests defendant would have overlooked these problems and renewed her contract if she had not complained about the social development group materials. Thus, she could not defeat defendant's motion on this claim even if she had engaged in protected speech.

**State Claim**

In the last count of her complaint, Brennan asserts a state-law claim for tortious interference with prospective business advantage. Having dismissed the federal claims in this suit, the Court declines to exercise its supplemental jurisdiction over this state-law claim. *See* 28 U.S.C. § 1367(c)(3).

**Conclusion**

For the reasons set forth above, there is no genuine issue of material fact on the federal claims Brennan asserts against defendant, which is entitled to a judgment as a matter of law on those claims. Defendant's motion for summary judgment [doc. no. 25] is, therefore, granted in part. The Court declines to exercise its supplemental jurisdiction over plaintiff's state-law claim, which is dismissed without prejudice to filing in state court. This case is hereby terminated.

**SO ORDERED.** ENTERED: 11/29/05

*[signature]*
HON. RONALD A. GUZMAN
**United States District Judge**